AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original    ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

United States of America,

v.

HEATHER REBECCA NELSON,

Defendants

Case No.    2:24-MJ-05200-DUTY

**LODGED**
CLERK, U.S. DISTRICT COURT

8/27/2024

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ MMC _____ DEPUTY

**FILED**
CLERK, U.S. DISTRICT COURT

8/27/24

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ MR _____ DEPUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of August 12, 2024, in the County of Los Angeles in the Central District of California,

the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(g)(1) | Felon in possession of a firearm |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/
*Complainant's signature*

Supervisory Special Agent Christopher C. Harris, FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    8/27/2024

*Judge's signature*

City and state:    Los Angeles, California

Hon. Pedro V. Castillo, U.S.M.J.
*Printed name and title*

AUSA:    Kedar S. Bhatia (x4442)

## **AFFIDAVIT**

I, Christopher C. Harris, being duly sworn, declare and state as follows:

### I.    **PURPOSE OF AFFIDAVIT**

1.    This affidavit is made in support of a criminal complaint and arrest warrant against HEATHER REBECCA NELSON for a violation of 18 U.S.C. § 922(g)(1) (felon in possession of a firearm).

2.    This affidavit is also made in support of a search warrant for a purple Apple iPhone with a clear case, designated as Evidence Item No. 14 in County of Los Angeles Sheriff's Department ("LASD") URN File No. 924-11950-2664-151 (the "SUBJECT DEVICE"), as described in Attachment A. The items to be seized are the evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 922(g)(1) (felon in possession of a firearm), 924(c) (use or carrying a firearm in furtherance of a crime), 933 (trafficking in firearms), 371 (conspiracy to violate Sections 922(g)(1), 924(c), and 933) (the "Subject Offenses"), as described in Attachment B. Attachments A and B are incorporated herein by reference.

3.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there

is sufficient probable cause for the requested complaint, arrest warrant, and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. <u>**BACKGROUND OF AFFIANT**</u>

4.  I am a Supervisory Special Agent with the Federal Bureau of Investigation and have been so employed since January 2016. I received basic law enforcement training at the FBI Academy in Quantico, Virginia, from September 2017 to February 2018. This training included segments on conducting criminal investigations, narcotics identification, firearm crimes, gangs and other law enforcement topics. I am currently assigned to the Lancaster Resident Agency as the supervisor of a criminal squad. I was previously assigned to the Los Angeles Metropolitan Task Force on Violent Gangs (the "Task Force"), a multi-agency task force led by the FBI, which includes the Los Angeles Police Department ("LAPD"), Drug Enforcement Administration, and the Bureau of Alcohol, Tobacco, Firearms and Explosives.

5.  Prior to becoming a Special Agent, I was employed as a Police Officer for the City of New Orleans from March 2003 to January 2016. During this time, I served in various roles, including patrol officer, person/property detective, homicide

detective, and task force officer with the New Orleans Office of the FBI. During my tenure as a police officer, I investigated violations of both state and federal law, to include gang and narcotics violations. I have interviewed numerous gang members, narcotics traffickers, cooperating subjects, and confidential human sources.

6.  During my tenure with the FBI, I have participated in numerous investigations of violent crime, drug trafficking organizations, and large-scale street gangs, including criminal enterprise investigations that have involved court-authorized interception of wire, oral, and electronic communications. I have become familiar with the methods, language, structures, and criminal activities of street gangs and transnational organized crime groups, including MS-13, operating in and through this judicial district. I have become familiar with the street and leadership level extortion activities of these gangs, as well as their reliance on firearms. I have become familiar with the types and amount of profit made by drug smugglers and the methods, language, and terms that are used to disguise the source and nature of the profits from their illegal narcotic dealings.

7.  During the course of my career, I have personally interviewed gang members and narcotics traffickers in gang and narcotics investigations that I have worked. I have participated

in the debriefing of cooperators and confidential human sources who had personal knowledge regarding criminal street gang activity, major narcotics trafficking organizations, and other criminal offenses, including violent crimes. Through these efforts, I have become very familiar with the methods used by gang members and narcotics traffickers. Specifically, I have become knowledgeable about the investigative techniques that are useful and viable in certain situations and those that are not. I have also consulted with other investigators who have extensive training and experience in criminal enterprises.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

8.    On or about August 12, 2024, LASD Deputy Sheriffs were conducting a patrol in the city of Littlerock, California. The Deputy Sheriffs saw NELSON riding a red colored dirt bike and violating multiple violations of California Vehicle Codes, including riding a dirt bike on a roadway, driving with no license plate, and not utilizing a turn signal.

9.    Due to the observed traffic violations, the Deputy Sheriffs stopped NELSON on her dirt bike. They informed NELSON of the violations and asked if she had a driver's license. NELSON told the Deputy Sheriffs she did not have a driver's license or any other form of identification on her person. When asked if she had any firearms on her person, NELSON responded that she did not.

10.  The Deputy Sheriffs asked NELSON to step off the dirt bike and walk to the front of the police vehicle. NELSON was wearing a helmet and had a duffel bag across her chest. Upon stepping off the dirt bike, the Deputy Sheriffs assisted NELSON with taking off the duffel bag and placed the bag upon the hood of their police vehicle.

11.  While obtaining identifying information from NELSON, a Deputy Sheriff noticed the duffel bag on the hood was sliding down, at which time a Deputy Sheriff pushed the bag further onto the hood of the police vehicle. The Deputy Sheriff felt what appeared to be a buttstock of a firearm within NELSON's bag. The Deputy Sheriff asked NELSON if there was a firearm within her bag, and she responded that there was a BB-gun.

12.  The Deputy Sheriff checked the bag for weapons and discovered an AR-15 style rifle. Additionally, the Deputy Sheriff located a loaded shotgun within the bag as well as additional AR-15 upper and lower receiver. NELSON was then placed under arrest for unlawful possession of firearms and handcuffed. When NELSON was arrested, Deputy Sheriffs found the SUBJECT DEVICE, a cellphone, on her person.

13.  At the time NELSON possessed the firearms, she had previously been convicted of fourteen felony offenses, each punishable by a term of imprisonment exceeding one year. She was

therefore prohibited from possessing the firearms and
ammunition.

## IV.   <u>STATEMENT OF PROBABLE CAUSE</u>

### A. LASD Arrests NELSON with Multiple Firearms

14. Based on my review of law enforcement reports,
conversations with other law enforcement agents, and my review
of body-worn camera footage, I have learned the following:

a.   On or about August 12, 2024, LASD Deputy Sheriffs
were conducting a patrol around the area of 106th Street East
and Avenue T in the city of Littlerock, California. The Deputy
Sheriffs were driving in a marked LASD vehicle and were wearing
LASD uniforms.

b.   The Deputy Sheriffs observed NELSON riding on red
colored dirt bike south on 106th Street East towards Avenue T,
in violation of California Vehicle Code 38025(a). Additionally,
the Deputy Sheriffs observed the dirt bike did not have any
license plates, in violation of California Vehicle Code 5200(a),
and did not use a turn signal when it made a turn east on Avenue
T, as there were no turn signals on the dirt bike, in violation
of California Vehicle Code 22108.

c.   Due to the traffic violations they saw, the
Deputy Sheriffs conducted a traffic stop. Upon stopping NELSON
on her dirt bike, the Deputy Sheriffs informed NELSON of the
violations and asked if she had a driver's license. NELSON

informed the Deputy Sheriffs she did not have a driver's license
or any other form of identification on her person.

       d.   The Deputy Sheriffs asked NELSON to step off the
dirt bike and walk to the front of the police vehicle. The
Deputy Sheriffs asked if NELSON had any weapons on her, and
NELSON replied she did not.

       e.   NELSON was wearing a helmet and had a duffel bag
across her chest. Upon stepping off the dirt bike, the Deputy
Sheriffs assisted NELSON with taking off the duffel bag and one
of the Deputy Sheriffs placed the bag on the hood of their
police vehicle. As the Deputy Sheriffs took the bag and placed
it on the hood of the police vehicle, NELSON immediately
asserted she did not give consent to search her bag.

       f.   NELSON was instructed by the Deputy Sheriffs to
have a seat on the front push bar of the vehicle while the
Deputy Sheriffs determined her identity. While utilizing the
hood to write down NELSON's name, one of the Deputy Sheriffs
noticed the bag was sliding down the hood of the vehicle. Upon
pushing the bag further onto the hood of the police vehicle, the
Deputy Sheriff noticed what appeared to them to be a buttstock
of a firearm. The Deputy Sheriff informed NELSON that he felt
what appeared to be a buttstock of a weapon within her bag.

       g.   NELSON again denied there was anything illegal in
her bag and again said she did not give consent to look in her

duffel bag. The Deputy Sheriff informed NELSON that he was going to check the bag for weapons, at which time NELSON stated there was a "BB gun" within the bag.

        h.   Upon opening the bag, the Deputy Sheriff located an AR-15 style rifle, which the Deputy Sheriff knew to be a real firearm and not a BB gun. Additionally, the Deputy Sheriff located a shotgun within the bag. NELSON was then placed under arrest for unlawful possession of firearms and handcuffed. Deputy Sheriffs then searched NELSON's person and found three plastic baggies containing a white crystal substance resembling methamphetamine and six blue circular "M-30" pills resembling fentanyl in her front right shorts pocket.

## B.    NELSON Claims She Thought She Was Buying "BB-guns"

    15.  Based on my review of law enforcement reports and my conversation with other law enforcement agents, I know that, after being arrested, NELSON was advised of her *Miranda* rights and agreed to speak with law enforcement officers. NELSON said, among other things, the following:

        a.   NELSON stated that she lived at a particular address in Littlerock, California (the "NELSON Residence"). NELSON stated that she had purchased BB guns from a particular individual ("CC-1") for $450. During the interview, NELSON told officers that her phone contained a photograph of CC-1. Officers retrieved the phone, the SUBJECT DEVICE, and showed it to

NELSON. NELSON identified the SUBJECT DEVICE as belonging to
her. NELSON navigated to the photograph application on the
SUBJECT DEVICE and opened the application. When the application
opened, one of the officers observed numerous photographs
displayed in a grid format. The photographs depicted the same
style firearm with a scope, short barrel, and black AR-15 style,
as one of the firearms that had been recovered from NELSON's
duffel bag earlier.

      b.    Upon seeing the photographs, NELSON quickly
scrolled away from the photographs. In doing so, one of the
officers observed further photographs of an unknown female in a
green shirt, standing against a bed in what appeared to be a
bedroom holding the same style firearm with a scope, short
barrel, and black AR-15 style, as one of the firearms that had
been recovered from NELSON's duffel bag earlier. One of the
officers questioned NELSON about the photograph, and NELSON
responded that she knew the person photographed by a particular
name and that person had photographed the firearm with the
intent to sell the firearm to obtain money for bail.

**C.    The Search of NELSON's Residence Reveals More Firearms and
Ammunition**

    16.  Based on my review of law enforcement reports, I have
learned that, following the interview with NELSON, LASD Deputy
Sheriffs sought a warrant to search the NELSON Residence. On or

about August 13, 2024, the Hon. Joel M. Wallenstein, Superior Court of Los Angeles, authorized a warrant to search the NELSON Residence. On or about August 13, 2023, LASD Deputy Sheriffs searched NELSON's residence pursuant to the warrant.

17. Based on my review of law enforcement reports, I have learned the following:

a.    In the master bedroom of NELSON's residence, officers found a purse with mail addressed to NELSON, as well as other individuals. They found in the same master bedroom a black AR-style pistol with a black scope; a black plastic replica lower receiver of a Ruger pistol; an MFT 556 Caliber rifle magazine; a black AMEND2 rifle magazine; a black rifle magazine containing 11 live rounds of ammunition; a brown suede cloth pistol case; and one live round of .40 caliber ammunition.

b.    In a spare bedroom, officers also recovered a black nylon rifle case; a black MOE rifle upper receive with black handguards; a black Colt Magazine 38 auto; a clear plastic square case with seven rounds of live ammunition; and a plastic square case with firearm cleaning parts.

c.    On the kitchen table, officers recovered a black magazine that contained ten rounds of live .22 caliber

ammunition and one cardboard box that contained eighteen live

rounds of 410 caliber ammunition.[1]

D.   **NELSON's Criminal History**

18.  As set forth below, NELSON has been convicted of

several felony offenses, making her possession of several

firearms unlawful. Specifically, based on my review criminal

history records for NELSON via her National Crime Information

Center report, I have learned that NELSON has the following

felony convictions, among others:

a.   On or about June 13, 1995, NELSON was convicted

of Receiving Stolen Property, in violation of California Penal

Code § 496(A) and was sentenced to three years of probation and

7 days in county jail.

b.   On or about November 2, 1995, NELSON was

convicted of Robbery in the First Degree, in violation of

California Penal Code § 211, and was sentenced to three years in

state prison.

---

[1] Based on my review of law enforcement reports, I have learned
the LASD Deputy Sheriffs also encountered two other individuals
in the NELSON Residence ("Individual-1" and "Individual-2").
After being arrested, both of the individuals were advised of
their *Miranda* rights and agreed to speak with officers. Among
other things, Individual-1 stated that he lived at the NELSON
Residence with NELSON. Individual-1 denied any knowledge of the
firearms and ammunition, despite many of the items being in
plain view through the residence. Individual-2, who had the keys
to a vehicle that was parked nearby and was found to contain a
magazine and pistol holster, denied having knowledge of the
magazine and pistol holster that were found in his vehicle.

c.   On or about December 20, 1995, NELSON was convicted of Robbery in the First Degree, in violation of California Penal Code § 211, and was sentenced to three years in state prison.

d.   On or about October 25, 1999, NELSON was convicted of Burglary, in violation of California Penal Code § 459, and was sentenced to two years in state prison.

e.   On or about August 21, 2001, NELSON was convicted of Forgery, in violation of California Penal Code § 470(d), and was sentenced to six years in state prison.

f.   On or about December 22, 2008, NELSON was convicted of Access Card Theft, in violation of California Penal Code § 484f(b), and was sentenced to five years in state prison.

g.   On or about August 2, 2013, NELSON was convicted of Vandalism, in violation of California Penal Code § 594(a), and was sentenced to three years of probation and 29 days in county jail.

h.   On or about September 12, 2013, NELSON was convicted of Possession of Drug Paraphernalia, in violation of California Health and Safety Code § 11364.1(a), and was sentenced to twenty-four months of probation and 45 days in county jail.

i.   On or about January 20, 2015, NELSON was convicted of Firearm Access Violations, in violation of

California Penal Code § 29800(a)(1), and was sentenced to thirty-two months in state prison.

j.   On or about September 21, 2016, NELSON was convicted of Grand Theft, in violation of California Penal Code § 484e(d), and was sentenced to six years in state prison.

k.   On or about August 23, 2016, NELSON was convicted of Possession of Contraband in Jail, in violation of California Penal Code § 4573.6(a), and was sentenced to three years in state prison.

l.   On or about July 9, 2020, NELSON was convicted of Burglary, in violation of California Penal Code § 459, and was sentenced to two years in state prison.

m.   On or about November 5, 2020, NELSON was convicted of Burglary, in violation of California Penal Code § 459, and was sentenced to eight months in state prison.

n.   On or about July 22, 2021, NELSON was convicted of Burglary, in violation of California Penal Code § 459, and was sentenced to sixteen months in state prison.

E.   **Interstate Nexus**

19. Based on my communications with FBI Special Agent Robert McElroy, I have learned that on or about August 26, 2024, Special Agent McElroy, who is a certified interstate nexus examiner, examined the firearms that were collected by LASD on August 12, 2024. Based on his examination, SA McElroy determined

13

that the shotgun found in NELSON's bag was manufactured outside the state of California, and therefore must have travelled in interstate commerce to have been recovered in California.

### V.    TRAINING AND EXPERIENCE ON FIREARMS OFFENSES

20.    Based on my training and experience and familiarity with investigations into unlawful firearms possession and firearms trafficking conducted by other law enforcement agents, I know the following:

a.    Firearms trafficking is a business that involves numerous co-conspirators, as well as associates to obtain the firearms, sell them, receive them, and then resale to others, and then to launder the proceeds. Firearms traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct transactions, and transport firearms or firearms proceeds. Likewise, even unlawful possession of a firearm by a felon requires co-conspirators, as those convicted of felonies typically cannot buy firearms through lawful channels.

b.    Firearms traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of firearms. The aforementioned records are often

maintained where the trafficker has ready access to them, such as on their cell phones and other digital devices.

c.    Communications between people buying and selling firearms take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices. This includes sending photos or videos of the firearms between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring a protection weapon to a deal. In addition, it is common for people engaged in firearms trafficking to have photos and videos on their cell phones of firearms they or others working with them possess, as they frequently send these photos to each other and others to boast about the firearms or facilitate firearms sales.

d.    Firearms traffickers often keep the names, addresses, and telephone numbers of their trafficking associates on their digital devices. Traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

e.    Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices, which can be synced together using online services.

21.   Based on my training and experience, the firearms found on NELSON's person when she was arrested had a substantial value, given that they were two popular AR-style firearms and one shotgun. High-value trips like the one undertaken by NELSON when she was arrested frequently require advance planning, time to acquire multiple firearms, and the development of trust between co-conspirators. For that reason, as set forth in Attachment B, I am seeking to seize records from the SUBJECT DEVICES relevant to the period from June 1, 2024, to August 20, 2024.

## VI.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES

22.   As used herein, the term "digital device" includes the SUBJECT DEVICES, which are cellphones.

23.   Based on my experience, training, and familiarity with cellphones, I am aware of the following:

a.   Cellphones frequently have telephone directory features, as well as methods to learn the call number associated with each cellphone, such as caller-identification features. Cellphones also typically contain records of recent call activity, both incoming and outgoing calls, and lists of stored telephone numbers and other identifying information, such as names. Cellphone users often maintain lists, such as address books or contact information, that are stored on the cellphone or its SIM or memory card.

b.    Cellphones typically have voicemail or voice-mailbox features that allow callers to leave voice and/or alphanumeric messages if the cellphone user does not answer. Voicemail is typically stored on the computer network of the provider of the cellphone's telephone service, which network is external to the cellphone, but may also be stored on the cellphone itself.

c.    Cellphones typically have messaging capabilities, including text, data, chat, digital photographs and video, MMS (i.e., multimedia messaging service), and SMS (i.e., short message service) messaging and email (collectively, "text messages"), that permit the cellphones user to send and receive text messages, including messages with digital photographs and video attached. Text messages and any attachments are typically stored on the computer network of the provider of the cellphone's telephone service, which network is external to the cellphones, but may also be stored on the cellphones itself.

d.    Cellphones often have electronic calendar features that allow the cellphone user to schedule appointments and meetings. Cellphones users often use that feature to remind themselves of meetings and appointments with friends and confederates.

e.    In addition to voicemail and text-messaging features, cellphones typically offer capabilities such as

17

sending and receiving email, and accessing and downloading information from the Internet.

        f.   Cellphones may have applications installed, including social media and messaging applications that permit the user to communicate with contacts using these applications.

        g.   Cellphones with camera functions permit the cellphone user to take photographs and videos, which are stored on the cellphone itself.

        h.   Cellphones may record location data that records where the user has carried or used the cellphone.

        i.   The information described above usually remains accessible in the cellphone's memory even if the cellphone has lost all battery power and has not been used for an extended period of time.

24. Based on my training and experience, I also know that, where electronic devices such as the Subject Device are used in furtherance of criminal activity, evidence of the criminal activity can often be found months or years after the criminal activity occurred. This is typically true because:

        a.   Electronic files can be stored on an electronic device for years at little or no cost and users thus have little incentive to delete data that may be useful to consult in the future.

b.    Even when a user does choose to delete data, the
data can often be recovered months or years later with the
appropriate forensic tools. When a file is "deleted" on an
electronic device, the data contained in the file does not
actually disappear, but instead may remain on the device, in
"slack space," until it is overwritten by new data that cannot
be stored elsewhere on the device. Similarly, files that have
been viewed on the Internet are generally downloaded into a
temporary Internet directory or "cache," which is only
overwritten as the "cache" fills up and is replaced with more
recently viewed Internet pages. Thus, the ability to retrieve
data from an electronic device depends less on when the file was
created or viewed than on a particular user's operating system,
storage capacity, and computer habits.

c.    In the event that a user changes electronic
devices, like a cellphone, the user will typically transfer
files from the old device to the new device, so as not to lose
data.

25.   Based on the foregoing, I respectfully submit that
there is probable cause to believe NELSON is engaged in the
Subject Offenses, and that evidence, fruits, and/or
instrumentalities of the Subject Offenses will be found on the
SUBJECT DEVICE. In addition, based on the foregoing, I
respectfully submit there is probable cause to believe that the

SUBJECT DEVICE constitute instrumentalities of the Subject
Offenses and are therefore subject to seizure.

26.   Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that the following electronic evidence, inter alia, is
often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or
remnants of such files months or even years after the files have
been downloaded, deleted, or viewed via the Internet. Normally,
when a person deletes a file on a computer, the data contained
in the file does not disappear; rather, the data remain on the
hard drive until overwritten by new data, which may only occur
after a long period of time. Similarly, files viewed on the
Internet are often automatically downloaded into a temporary
directory or cache that are only overwritten as they are
replaced with more recently downloaded or viewed content and may
also be recoverable months or years later.

b.   Digital devices often contain electronic evidence
related to a crime, the device's user, or the existence of
evidence in other locations, such as, how the device has been
used, what it has been used for, who has used it, and who has
been responsible for creating or maintaining records, documents,
programs, applications, and materials on the device. That
evidence is often stored in logs and other artifacts that are

not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

27.    Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b.   Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

## VII. **CONCLUSION**

28.  For all of the reasons described above, I submit that there is probable cause to believe that NELSON has committed a violation of 18 U.S.C. § 922(g)(1) (felon in possession of a firearm).

29.  Further, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the Subject Offenses will be found on the SUBJECT DEVICE, as described in Attachment A.

Attested to by the applicant
in accordance with the
requirements of Fed. R. Crim.

P. 4.1 by telephone on this
__27th__ day of August, 2024.

_____
HON. PEDRO V. CASTILLO
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A**

<u>PROPERTY TO BE SEARCHED</u>

The property to be searched is the following digital device (the "SUBJECT DEVICE"), which was seized on August 20, 2024, and are currently in the custody of County of Los Angeles Sheriff's Department ("LASD") in Riverside, California:

       a. A purple Apple iPhone with a clear case, designated as Evidence Item No. 14 in LASD URN File No. 924-11950-2664-151.

**ATTACHMENT B**

A. **ITEMS TO BE SEIZED**

1.    The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of Title 18, United States Code, Sections 922(g)(1) (felon in possession of a firearm), 924(c) (use or carrying a firearm in furtherance of a crime), 933 (trafficking in firearms), 371 (conspiracy to violate Sections 922(g)(1), 924(c), and 933) (the "Subject Offenses"), from July 1, 2024, to August 20, 2024, namely:

a.    Records reflecting the possession, purchase, transfer, or sale of firearms or ammunition, or attempts to do the same.

b.    Records reflecting proceeds from the Subject Offenses.

c.    Records related to communications with co-conspirators in the Subject Offenses.

d.    Records related to the identities and roles of conspirators or aiders and abettors to the Subject Offenses.

e.    Records related to the nature and development of the relationships among co-conspirators in and witnesses to the Subject Offenses, such as personal, social, and familial connections, prior dealings, financial compensation, and loans.

f.    Records reflecting efforts to conceal the Subject Offenses or avoid detection by law enforcement, such as the use of bags to transport firearms.

g.    Records related to motive for the Subject Offenses, including but not limited to communications relating to debts or other financial obligations.

h.    Evidence of efforts to use and use of encrypted applications, programs, and devices.

i.    Records related to the location of other evidence of the Subject Offenses, including but not limited to communications reflecting registration of online accounts potentially containing relevant evidence and financial accounts.

j.    Records related to who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence.

k.    Records related to the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software.

l.    Records related to attachment of other devices.

2

      m.   Records related to counter-forensic programs (and associated data) that are designed to eliminate data from the device.

      n.   Records related to the times the device was used.

      o.   Records related to passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device.

      p.   Records related to applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it.

      q.   Records related Internet Protocol addresses used by the device.

2.  As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, messages, emails, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.  Any SUBJECT DEVICE which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

4.    With respect to any SUBJECT DEVICE containing evidence falling within the scope of the foregoing categories of items to be seized:

a.    evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted;

b.    evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.    evidence of the attachment of other devices;

d.    evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

e.    evidence of the times the device was used;

f.    applications, programs, software, documentation, manuals, passwords, keys, and other access devices that may be necessary to access the device or data stored on the device, to run software contained on the device, or to conduct a forensic examination of the device;

g.    records of or information about Internet Protocol addresses used by the device.

5.    As used herein, the terms "records," "information," "documents," "programs," "applications," and "materials" include records, information, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

**B. <u>SEARCH PROCEDURE FOR THE SUBJECT DEVICE</u>**

6.    In searching the SUBJECT DEVICE (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.    Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") may search the SUBJECT DEVICE capable of being used to facilitate the above-listed violations or containing data falling within the scope of the items to be seized.

b.    The search team will, in its discretion, either search the SUBJECT DEVICE where they are currently located or transport them to an appropriate law enforcement laboratory or similar facility to be searched at that location.

c.    The search team shall complete the search of each SUBJECT DEVICE as soon as is practicable but not to exceed 120 days from the date of issuance of the warrant. The government will not search the digital device and/or forensic images

thereof beyond this 120-day period without obtaining an extension of time order from the Court.

       d.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

       i.   The search team may subject all of the data contained in each SUBJECT DEVICE capable of containing any of the items to be seized to the search protocols to determine whether the SUBJECT DEVICE and any data thereon falls within the scope of the items to be seized. The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of the items to be seized.

       ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

       iii. The search team may use forensic examination and searching tools, such as "EnCase," "Griffeye," and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

       e.   The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

f.    If the search determines that a SUBJECT DEVICE does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the SUBJECT DEVICE and delete or destroy all forensic copies thereof.

g.    If the search determines that a SUBJECT DEVICE does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

h.    If the search determines that a SUBJECT DEVICE is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

i.    The government may also retain a SUBJECT DEVICE if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

j.    After the completion of the search of a SUBJECT DEVICE, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

7.    The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

8.    The special procedures relating to the digital device found in this warrant govern only the search of the digital device pursuant to the authority conferred by this warrant and do not apply to any search of digital device pursuant to any other court order.